J-S09033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
KIRAN JONNALA   :
  :
Appellant   :   No. 977 EDA 2023

Appeal from the Judgment of Sentence Entered February 16, 2023
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0003467-2021

BEFORE:  PANELLA, P.J.E., NICHOLS, J., and BECK, J.

MEMORANDUM BY BECK, J.:            **FILED MAY 15, 2024**

Kiran Jonnala ("Jonnala") appeals from the judgment of sentence imposed by the Chester County Court of Common Pleas ("trial court") following his convictions of false reports of child abuse and retaliation against a witness, victim, or party.[1]  On appeal, Jonnala challenges the sufficiency and weight of the evidence presented to support his convictions, as well as the trial court's decision to allow expert testimony in attorney professional ethics and discipline at trial.  Because we find no merit to Jonnala's claims, we affirm.

The record reflects that in October 2020, Jonnala lived in Exton, Pennsylvania in the same community as Andrew Schneider ("Schneider").  Jonnala's son A.J. and Schneider's son N.S. were both about thirteen years

---

[1]  18 Pa.C.S. §§ 4906.1, 4953(a).

old at the time, attended the same school, and were involved in the same local Boy Scout troop. Jonnala and Schneider also attended various troop activities, campouts, and meetings with their sons.

On September 28, 2020, Schneider filed a lawsuit against the homeowners' association ("HOA"), where Jonnala served as president of its board of directors, involving a dispute over its obligation to maintain certain sections of lawn in a common area. Three weeks later, on October 19, 2020, Jonnala emailed the scout troop's committee chair, Andrew Nusbickel ("Nusbickel"), the following:

Dear Mr. Nusbickel,

Hope all is well with you and your family!!

My name is Kiran Jonnala and my son [A.J.] has been with Troop 76 for more than four years. He has been enjoying scouting very much, especially camping trips. I appreciate the efforts of all volunteers of Troop 76 and your leadership to make it possible to continue scouting in spite of the pandemic.

Since I never had a chance to be part of Boy Scouts as a child, I always thought it would be a very good opportunity for [A.J.] to learn and to become a productive citizen to bring joy to other people. Even though he didn't progress much in the last three years, I didn't care about it as I am more interested in his learning and life skills as more important to us.

Based on the last court of honor meeting, we also donated $1001 for Troop 76 new shed and hut expansion by check …. We always trusted that Troop 76 has done proper due diligence and background checks in selecting the volunteers for Troop 76 to provide a safe learning environment for kids.

But, I have a personal complaint against [] Schneider who is volunteering as Assistant ScoutMaster for Troop 76.[2]  We live in the same beautiful community Malvern Hunt in Exton and his son [N.S.] is in the same grade as [A.J.] at [Great Valley Middle School].  We always considered him as a family friend and [A.J.] used to play with [N.S.] many times.

I always felt his sarcastic comments and bragging himself as a lawyer winning a lawsuit against our HOA was kind of a smart move.  However, based on recent bullying efforts and harassing lawsuits against Malvern Hunt HOA community and other Board members, I believe he <u>broke the Scout law and Oath to guide or teach the kids to become a good citizen</u>.  As Malvern Hunt HOA Board president (volunteer), I am working with our attorneys to protect the community members and community reputation against such thoughtless act of [] Schneider.

> *Scout Law: A Scout is Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Brave, Clean, and Reverent.*
>
> *Scout Oath: On my honor I will do my best to do my duty to God and my country and to obey the Scout law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight.*

I also observed that [A.J.] is reluctant to meet or play with [N.S] and some changes that we couldn't understand.  We suspect that [] Schneider has done some kind of physical or emotional abuse to my son during last year's camping trips.  Also, I am working with my personal lawyer for a possible lawsuit against [] Schneider or BSA/Troop 76 for those abuses by the end of this week.  At the same time, many kids in Troop 76 are from Malvern Hunt and like to protect them from any kind of harassment and abuse by [] Schneider.

I request that [] Schneider should resign or be removed from his position of Assistant Scout Master at Troop 76 immediately and in future.  Also, I request you to keep away [] Schneider from my

---

[2]  Schneider was not, in fact, an assistant scoutmaster for the troop.  **See** N.T., 11/30/2022, at 170.

- 3 -

son and other kids at Troop 76 going forward. Otherwise, I have to email all parents to alert them to protect their kids against any kind of abuse or bullying effort by [] Schneider. I hope that my complaint is reviewed and addressed fairly. Hope it wouldn't impact my son's progress or activities at Troop 76. If you have any questions then I am happy to discuss this matter in detail. Look forward to hearing from you soon.

We truly appreciate all you do at Troop 76 to build future good citizens of our country.

Thank you for your time and effort!!

Sincerely,
Kiran Jonnala

N.T., 11/29/2022, at Ex. C-2 (emphasis in original; name corrections supplied). Nusbickel immediately talked to Jonnala by phone. During the phone call, Jonnala additionally reported that A.J. told him that while in a car on a scout activity, "there were advances or improper touching on going either to a trip or from a trip by [] Schneider" toward A.J.[3] *Id.* at 38-39; *see also id.* at 66, Ex. C-3 (Nusbickel's contemporaneous notes of phone call with Jonnala wherein Jonnala reported to him that Schneider was "abusive" and "made advances and touches" towards A.J.). When Nusbickel asked if he or someone with the scouts could talk to A.J., Jonnala declined. Jonnala knew— and Nusbickel reiterated to him during the phone call—that as scout troop

---

[3] One-on-one contact between adults and youth scout members is prohibited. N.T., 11/29/2022, at 55, Ex. D-1 (select page of Boy Scout Handbook).

committee chair, Nusbickel was statutorily mandated to report his allegations to Childline.[4, 5]

On October 20, 2020, Nusbickel reported Jonnala's allegations to Childline. Nusbickel also informed Schneider generally of the report against him and prohibited him from attending any troop meeting or activities until further notice.

Chester County Children, Youth, and Family Services ("CYFS") and the East Whiteland Township Police Department initiated investigations. CYFS caseworker Willietta Harris ("Harris") talked to Jonnala by phone on October 22, 2020, during which he reported that A.J. "told him the alleged perpetrator, [Schneider], touched him inappropriately." N.T., 11/30/2022, at 10. Jonnala stated to Harris that he did not want his son to know about the investigation

---

[4] Jonnala previously and successfully completed youth protection training through the Boy Scouts of America, which included training with respect to mandated reporters and their obligations. N.T., 11/29/2022, at 21-23, 27, Ex. C-1 (Jonnala's youth protection training certification).

[5] Childline is a unit within the Pennsylvania Department of Public Welfare that operates a statewide system for receiving reports of suspected child abuse, refers the reports for investigation, and maintains report files. 55 Pa.Code § 3490.4. The Childline Registry is maintained in accordance with the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301–6388. Persons required to report suspected child abuse, known as mandated reporters, are set forth in section 6311 of CPSL, which includes, in relevant part, an "individual paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, is a person responsible for the child's welfare or has direct contact with children." 23 Pa.C.S. § 6311(a)(7).

and "did not want his son's name to be in public records stating that he was a victim of sexual abuse." *Id.* at 11, Ex. C-5 (CYFS investigative report).

Later that day, Harris conducted a home visit assessment at Jonnala's house. Jonnala, his wife, Jyothi Jonnala ("Mrs. Jonnala"), A.J., and A.J.'s younger sibling were home during the visit. Harris interviewed Jonnala and Mrs. Jonnala together. Jonnala stated to Harris that "his son said he was touched inappropriately," explaining that "he and his son were talking about something else when the sexual abuse came up. His son said [] Schneider touched him inappropriately. His son did not provide any other details." *Id.* at 15, 17, Ex. C-5 (CYFS investigative report). Mrs. Jonnala said that she "heard about the sexual abuse from [] Jonnala" the day before. *Id.* at 14, 17, Ex. C-5 (CYFS investigative report). The parents escorted Harris upstairs to meet A.J. With his parents present, A.J. spoke briefly to Harris about the pandemic and school. *Id.* at Ex. C-5 (CYFS investigative report). However, Harris did not discuss the alleged abuse with A.J. because Jonnala refused to allow it. *Id.* at 13, 29, Ex. C-5 (CYFS investigative report).

East Whiteland Township Police Department Detective Patricia Doyle ("Detective Doyle") contacted Jonnala, explained the investigative process, and attempted to arrange an interview with A.J. Jonnala told Detective Doyle he did not want A.J. interviewed and asked Detective Doyle if he "could take it back," referring to his report of abuse. *Id.* at 56, Ex. D-3 (Detective Doyle's investigative report). When Detective Doyle asked Jonnala what A.J. told him,

"he could not give [her] an answer." *Id.* Jonnala eventually agreed to an interview of A.J. but when the date arrived, he canceled the same day. Thereafter, Jonnala stopped answering Detective Doyle's emails. After Detective Doyle informed Jonnala that he would be charged with hindering an investigation if he did not allow A.J. to be interviewed, Jonnala agreed to bring A.J. for an interview. Detective Doyle also talked to Schneider by phone, during which he denied doing anything inappropriate to A.J., and confirmed the litigation against the HOA.

Detective Doyle interviewed A.J. on November 18, 2020, at a child advocacy center. Detective Doyle had received specialized training in conducting child abuse investigations and forensic interviews of children and conducted over 200 such interviews of children. Detective Doyle, A.J., and a specially trained child advocate were the only people in the interview room. A.J.'s interview was recorded while Harris and the assistant district attorney assigned to the case watched live on a video monitor in a separate observation room. Jonnala was present in the building during the interview, but per protocol was not permitted to observe. During the interview, A.J. denied Schneider or anyone had ever touched him inappropriately. A.J. stated that on one occasion during a scout activity several months prior, he was sitting in the back seat of Schneider's car; he and Schneider were alone in the car together for a few seconds while N.S. ran into his house to get something and that nothing inappropriate happened. When Detective Doyle asked A.J. if he

knew why he was being interviewed, A.J. referenced "a guy who filed a lawsuit" and stated that he was "making trouble for the community." **Id.** at 90, Ex. D-2 (Detective Doyle's investigative report). Detective Doyle found A.J. credible, did not believe he had been "prepped," or that he was even all that aware of why he was being interviewed.

Following A.J.'s interview, Detective Doyle deemed the report unfounded and determined no further criminal investigation was warranted. While still at the child advocacy center, Detective Doyle informed Jonnala that A.J. did not disclose abuse by Schneider or anyone else, charges would not be filed against Schneider, and the case would be closed. Upon hearing this, Jonnala's first response was to ask her "what he was supposed to do because this guy [Schneider] was suing him." N.T., 11/30/2022, at 77.

Thereafter, Harris interviewed Schneider, who she found cooperative and not evasive. Schneider denied touching or saying anything inappropriate to A.J. Schneider stated that on one occasion, he had driven N.S., A.J., and at least three other scouts in his car to and from a scout camping trip. They left from a central location and as they were leaving, N.S. said he forgot his rain jacket at home. Schneider lived about a mile from the designated meeting spot, and thus drove to his house. N.S. ran inside to get his jacket and the group continued the trip less than a minute later. When N.S. was inside the house, Schneider said A.J. and the other scouts were in the car with

him and that he was never alone with A.J. Following her investigation, Harris concluded the report was unfounded and closed the case.

Jonnala was charged with one count each of harassment – course of conduct with no legitimate purpose; harassment – communicating lewd, threatening language; false reports of child abuse; false report – falsely incriminating another; retaliation against a witness, victim or party; and criminal attempt – retaliation against witness, victim or party.[6] Jonnala filed a motion challenging his preliminary hearing, which the trial court heard at a habeas corpus hearing on January 24, 2022. At the hearing, A.J. appeared and testified under oath. The trial court denied Jonnala's motion. A jury trial began on November 29, 2022 and spanned four days, during which the jury heard testimony from eight Commonwealth witnesses and four from the defense. Rather than call A.J. as a witness at trial, the parties stipulated to A.J.'s testimony, which provided, in pertinent part:

    c. [] Schneider never touched A.J.

---

[6] 18 Pa.C.S. §§ 2709(a)(3)-(4), 4906.1, 4906(a), 4953(a), 901(a). Initially, Schneider filed a private criminal complaint, but the Chester County District Attorney's office did not approve the complaint. Schneider appealed to the Chester County Court of Common Pleas, which granted the appeal. Prosecution was referred to the Pennsylvania Office of the Attorney General. **See** Docket Entry No. 6, 11/8/2021 (transcript of Docket No. MJ-15401-CR-0000208-2021 containing private complaint); Omnibus Pretrial Motion of the Commonwealth, 7/5/2022, ¶¶ 1-2; Motion in Limine, 7/12/2022, at Ex. C (notes of transcript of hearing on petition for review of district attorney's disapproval of private criminal complaint); **see also** Commonwealth's Brief at 7-8 n.2.

d. [] Schneider has never said anything inappropriate to A.J.

e. [] Schneider has never made A.J. feel uncomfortable.

f. A.J. never told [Jonnala], or anyone else, that [] Schneider touched him inappropriately, or said anything inappropriate, or made A.J. feel uncomfortable.

N.T., 11/30/2022, at Ex. C-8.

Following trial, the jury found Jonnala guilty of false reports of child abuse and retaliation against a witness, victim, or party, and not guilty of criminal attempt – retaliation against witness, victim, or party.[7] The trial court sentenced Jonnala to a term of one to twenty-three months of incarceration on each conviction, to be served concurrently. Jonnala filed post-sentence motions, raising various claims. The court denied the motions other than Jonnala's motion for bail pending appeal, which the court granted. This appeal followed.

Jonnala raises four issues for our consideration:

I.      Did the trial court err in convicting [Jonnala] of false reports of child abuse where the Commonwealth failed to prove that [Jonnala] made a report of any kind and instead showed only that [Jonnala] made a vague claim that he thought [Schneider] might have done something inappropriate with his son?

II.     Whether the trial court erred in convicting [Jonnala] of retaliation where the Commonwealth failed to show any link between [Jonnala's] actions and a lawsuit to which [Jonnala] was not a party and the Commonwealth failed to show that [Jonnala] said anything false to anyone?

---

[7] The remaining charges were withdrawn.

III. Whether the trial court erred in denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence?

IV. Whether the trial court erred in allowing the Commonwealth to call an expert witness to testify to the hypothetical professional discipline [Schneider] might have faced had he been charged with or convicted of child abuse given that the testimony was irrelevant because none of the hypothetical discipline occurred and the retaliation statute requires proof of actual, concrete harm rather than hypothetical harm?

Jonnala's Brief at 9-10.

Jonnala's first two claims challenge the sufficiency of the evidence to support his respective convictions of false reports of child abuse and retaliation against a victim, witness, or party. *Id.* at 30-44. Our Court's standard of review for a challenge to the sufficiency of the evidence is well settled:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Juray*, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted). The jury, sitting as factfinder at trial, "is free to believe all, part, or none of the evidence presented." *Commonwealth v. Williams*, 302 A.3d 117, 120 (Pa. Super. 2023) (quotation marks and citation omitted).

**I. Sufficiency of the Evidence – False Reports of Child Abuse**

- 11 -

With respect to his false reports of child abuse conviction, Jonnala argues the Commonwealth failed to prove that he made a report or said anything false. Jonnala's Brief at 30. According to Jonnala, he did not make a "report" under section 4906.1 because he did not report it to law enforcement or to the Pennsylvania Department of Human Services. *Id.* at 26, 30-31. Jonnala further argues that the Commonwealth failed to show that he "said anything false because the witnesses could not remember exactly what he said, their notes did not mention actual sexual misconduct, and there was a clear language barrier when Jonnala spoke with them." *Id.* at 27, 31-32, 39-41.

Jonnala acknowledges that this Court has held that reporting false allegations of child abuse to a mandated reporter or a child protective services agency employee has the same effect as making a direct report to law enforcement or Childline. *See id.* at 26, 31 (citing **Commonwealth v. Krankowski**, 304 A.3d 1275, 1279 (Pa. Super. 2023)). He argues, however, that **Krankowski** should be reconsidered because it is against the plain language of section 4906.1 and "fails to properly apply the rule of lenity" in favor of Jonnala. *Id.* at 26-27, 31-38.

Pursuant to the Pennsylvania Crimes Code, a person commits the crime of false reports of child abuse if "the person intentionally or knowingly makes a false report of child abuse under 23 Pa.C.S. Ch. 63 (relating to child protective services)." 18 Pa.C.S. § 4906.1. The term "report" in section

4906.1 of the Crimes Code "includes 1) making a disclosure to a mandated reporter, who is required by law to make a Childline Report and 2) making a disclosure directly to a child protective services agency employee and consequently prompting an investigation." ***Krankowski***, 304 A.3d at 1279. This Court explained that

> once an individual "gets the ball rolling" by disclosing false allegations of child abuse to a mandated reporter, the mandated reporter is required to make a Childline report, and the child protective services agency is required to investigate the allegation. Thus, the reporting of false allegations of child abuse to any mandated reporter has the same effect as making a direct disclosure to Childline or law enforcement. Likewise, if an individual discloses false allegations of child abuse to a child protective services agency employee and an investigation ensues, it has the same effect as making a direct disclosure to Childline or law enforcement. To hold otherwise would mean that an individual could contact a mandated reporter or a child protective services agency, make false allegations of child abuse which trigger an investigation, and suffer no consequence. This is an absurd and unreasonable result.

***Id.***

Instantly, the trial court rejected Jonnala's argument that he did not make a report under section 4906.1, pointing to record evidence of Jonnala's email to Nusbickel on October 19, 2020, wherein he reported suspected child abuse; Jonnala's disclosures of abuse to Nusbickel during their phone call; Nusbickel's status as a mandated reporter; and Jonnala's disclosures of abuse to Harris, both over the phone and during Harris' in-home visit. Trial Court Opinion, 7/25/2023, at 86-88. The trial court relied on section 6312 of CPSL

- 13 -

to find that Jonnala caused a report of suspected abuse to be made to Childline and CYFS.[8]  Trial Court Opinion, 7/25/2023, at 86.  The trial court found that Jonnala could not "insulate himself by not directly reporting the false claim of abuse when he knew that [] Nusbickel was mandated by law to report the allegations to the authorities," and that his disclosures to Nusbickel and Harris were sufficient to meet the reporting element of the statute.  *Id.* at 87-88.

The trial court also found no merit to Jonnala's argument that there was insufficient evidence that he said anything false.  *Id.* at 88.  The trial court pointed to A.J.'s stipulated testimony that Schneider never touched A.J., said anything inappropriate to A.J., or made A.J. feel uncomfortable, as well as Schneider's trial testimony denying all abuse allegations, to conclude that the evidence was sufficient to prove Jonnala's disclosures of abuse were false.  *Id.* at 88-89.

_____

[8]  At the time of the trial court's opinion, there was a dearth of case law involving section 4906.1, and **Krankowski** had not yet been decided.  Section 6312 of CPSL provides:

> Any person may make an oral or written report of suspected child abuse, which may be submitted electronically, or **cause a report** of suspected child abuse to be made to the [state] department [of human services], county agency or law enforcement, if that person has reasonable cause to suspect that a child is a victim of child abuse.

23 Pa.C.S. § 6312 (emphasis added).

To begin, we agree that the trial evidence was sufficient to prove that Jonnala made a report under section 4906.1. The record reflects that Jonnala disclosed to Nusbickel, a mandated reporter, that Schneider abused A.J. N.T., 11/29/2022, at 29-35, 37-40, 66, Exs. C-2 (Jonnala's October 19, 2020 email to Nusbickel), C-3 (Nusbickel's contemporaneous notes of phone call with Jonnala). Once Jonnala reported the abuse to Nusbickel, Nusbickel was statutorily required to report it to Childline, which he did. 23 Pa.C.S. § 6311(a)(7); N.T., 11/29/2022, at 42. Jonnala's disclosure to Nusbickel constitutes a report under section 4906.1. **See Krankowski**, 304 A.3d at 1279 (holding that the term "report" under section 4906.1 includes "making a disclosure to a mandated reporter, who is required by law to make a Childline Report[.]").[9]

Further, the evidence at trial was sufficient to show that Jonnala's report was false. Jonnala does not dispute that Schneider never touched, said anything inappropriate to, or made A.J. feel uncomfortable. N.T., 11/30/2022, at Ex. C-8 (A.J.'s stipulated testimony). Nonetheless, as detailed above, Jonnala reported to multiple people that A.J. told him that Schneider

_____

[9] At the time of this writing, Susan Krankowski is awaiting decision on the petition for allowance of appeal she filed with our Supreme Court. **Krankowski** therefore remains the law of this Commonwealth and this Court must follow it. **See Commonwealth v. Spease**, 911 A.2d 952, 959 (Pa. Super. 2006) (stating that panel opinions of the Pennsylvania Superior Court are binding precedent and this Court must follow them until overruled by the Superior Court sitting en banc or a higher court) (citation omitted).

had touched him inappropriately. The record demonstrates that Jonnala disclosed to Nusbickel, both in an email and over the phone, that A.J. told Jonnala he had been abused by Schneider. N.T., 11/29/2022, at 29-35, 37-40, 66, Exs. C-2 (Jonnala's October 19, 2020 email to Nusbickel), C-3 (Nusbickel's contemporaneous notes of phone call with Jonnala). Jonnala continued to maintain that falsehood to Harris during CYFS's investigation, reporting to her over the phone and in-person that A.J. told Jonnala that Schneider touched him inappropriately. N.T., 11/30/2022, at 10, 15, 17, Ex. C-5 (CYFS investigative report). Yet, when asked at trial whether A.J. ever told his father that he was abused by Schneider, Jonnala answered "No. Abuse, no. I think he just said he was one-on-one with Schneider." N.T., 12/1/2022, at 27.

Finally, Jonnala argues that the Commonwealth's witnesses failed to remember precisely what Jonnala said; their notes failed to detail any sexual misconduct; and they experienced a language barrier when talking to Jonnala. These arguments, however, go to the weight of the evidence, not its sufficiency. *See Commonwealth v. Thomas*, 194 A.3d 159, 167 (Pa. Super. 2018) ("It is well-settled that credibility determinations go to the weight, not the sufficiency of the evidence.") (citation and quotation marks omitted). That the jury weighed and credited the evidence in favor of the Commonwealth, rather than Jonnala, does not go to its sufficiency, as in reaching its verdict,

the jury was free to believe all, part, or none of the evidence. ***Williams***, 302 A.3d at 120.

The evidence at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to sustain Jonnala's conviction of false reports of child abuse. ***See Krankowski***, 304 A.3d at 1279. Accordingly, Jonnala's first issue merits no relief.

## II.  <u>Sufficiency of the Evidence – Retaliation</u>

Turning to Jonnala's claim that there is insufficient evidence to support his retaliation conviction, he asserts that the Commonwealth failed to prove a link between the lawsuit filed by Schneider and Jonnala's report of child abuse against him.  Jonnala's Brief at 41-42.  Jonnala says that he "may have overreacted" or "may have been misunderstood due to the language barrier," and contends that "without more specific accusations or better memories from the witnesses," there was no evidence to prove Jonnala intended to harm Schneider in retaliation for the lawsuit or that Jonnala knowingly made false statements. ***Id.*** at 41-42, 44.  Jonnala submits that he made a "vague complaint" to Nusbickel; he made no report to Detective Doyle; Harris could not remember exactly what Jonnala said to her and her notes did not contain allegations of sexual contact; Jonnala was not named as a defendant in the lawsuit filed by Schneider; and the lawsuit would not have affected Jonnala personally. ***Id.*** at 42-43.  According to Jonnala, "he did not understand the

potential consequences of" his report to Nusbickel and when it "escalated into a law enforcement investigation, he immediately attempted to put an end to it." *Id.* at 43. He also argues that inconsistent evidence as to whether A.J. was ever alone with Schneider shows Jonnala's concerns about Schneider were legitimate. *Id.* at 44.

Under the Pennsylvania Crimes Code, a person commits the crime of retaliation "if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party in a civil matter." 18 Pa.C.S. § 4953(a).

In its opinion, the trial court reiterated its finding of no merit to Jonnala's claim that there was insufficient evidence that he said anything false and further concluded that the evidence was sufficient to establish that Jonnala made the false statements in retaliation to the lawsuit filed by Schneider. Trial Court Opinion, 7/25/2023, at 90-92. The trial court pointed to evidence of the lawsuit; Jonnala's email; A.J.'s interview; Jonnala's reaction upon learning A.J. denied any abuse; Jonnala's testimony that he thought Schneider was a bully; Jonnala's inconsistent testimony about whether he had told A.J. about the Schneider lawsuit; and Jonnala's testimony that "maybe" he told A.J. that Schneider was making trouble for the neighborhood. *Id.* at 91-92.

The record reflects that Schneider filed a lawsuit against the HOA where Jonnala served as president. N.T., 11/30/2022, at 151, 185, Ex. C-10 (HOA

lawsuit). Three weeks later, Jonnala, who was trained in youth protection and mandated reports of child abuse, made child abuse allegations against Schneider to a mandated reporter. N.T., 11/29/2022, at 21-23, 27, Ex. C-1 (Jonnala's youth protection training certification). Jonnala's email to Nusbickel primarily focused on complaints of Schneider's "bullying" and "harassing" behavior with respect to the HOA lawsuit, and only mentioned non-specific allegations of abuse in passing toward the end of the email. *Id.* at Ex. C-2 (Jonnala's October 19, 2020 email to Nusbickel).

When Nusbickel talked to Jonnala by phone, Jonnala continued to be vague in his allegations, but he did make allegations of abuse against Schneider and he refused to allow Nusbickel to talk to A.J. *Id.* at 39-40. Nusbickel made it clear to Jonnala that, as a mandated reporter, he was required to report the abuse allegations to Childline. *Id.* at 37-39. When CYFS started its investigation, Jonnala continued in his claim that Schneider abused A.J. but refused to allow Harris to talk to A.J. about the alleged abuse and initially refused to allow A.J. to be interviewed by Detective Doyle. N.T., 11/30/2022, at 13, 29, 56-58, 108, Exs. C-5 (CYFS investigative report), D-3 (Detective Doyle's investigative report).

Once Jonnala finally allowed A.J. to be interviewed, the child plainly told Detective Doyle that no one, including Schneider, had abused him. *Id.* at 76, Exs. C-6A (video recording of A.J.'s forensic interview), C-6B (transcript of A.J.'s forensic interview), C-8 (A.J.'s stipulated testimony), D-3 (Detective

Doyle's investigative report). A.J. was unsure why he was being interviewed, but he indicated that he knew about a lawsuit and that his father had told him Schneider was making trouble for the community. *Id.* at 90. Jonnala stipulated to A.J.'s testimony, including that A.J. never told his father, or anyone else, that Schneider touched him inappropriately. *Id.* at Ex. C-8 (A.J.'s stipulated testimony). When Jonnala learned for the first time what A.J. said in the interview with Detective Doyle, his immediate response was not an expression of relief that A.J. had not been abused, but concern over what to do about the Schneider lawsuit. *Id.* at 77.

The jury was free to determine that the totality of the circumstances— including the timing of Jonnala's false reports of Schneider's abuse in relation to the filing of the lawsuit and Jonnala's statements and behavior— demonstrated that he made the false reports in retaliation to the HOA lawsuit filed by Schneider. The evidence sufficiently established that Schneider was harmed[10] when Jonnala engaged in an unlawful act (the false report of child abuse) in retaliation for something lawfully done in the capacity of a party in a civil matter (the lawsuit filed by Schneider). *See* 18 Pa.C.S. § 4953(a). As the evidence at trial, with all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner,

_____

[10] As discussed infra, Jonnala concedes Schneider was harmed by Jonnala's false reports of child abuse. *See* Jonnala's Brief at 51-52, 54.

were sufficient to sustain Jonnala's conviction of retaliation against a victim, Jonnala's second claim fails.

### III.   **Weight of the Evidence**

In his third issue, Jonnala alternatively argues that the verdict is against the weight of the evidence.[11]  Jonnala's Brief at 45-50.  Jonnala contends that evidence of his false statement is "so unreliable that the conviction shocks the conscience."  Jonnala's Brief at 45.  He submits that the evidence against him was "extremely thin" and further, that it was "telling" that the Chester County District Attorney's office disapproved Schneider's private criminal complaint, evidence of which the trial court did not allow the jury to hear.  *Id.* at 46. According to Jonnala, there was overwhelming evidence that he and Mrs. Jonnala had a genuine concern that some kind of abuse occurred when A.J. was in Schneider's car as A.J.'s behavior subsequently changed.  *Id.* at 46-48.  Jonnala points to testimony presented concerning his reputation in the community for law-abidingness and honesty, as well as immunity from prosecution for reports of child abuse made in good faith and the presumption of good faith in making such reports.  *Id.* at 47 (citing 23 Pa.C.S. § 6318(a), (c)).  He requests a new trial.  *Id.* at 50.

The following legal principles apply to a trial court's consideration of a challenge to the weight of the evidence supporting a conviction:

---

[11]  Jonnala properly preserved this claim by first raising it in his post-sentence motion.  *See* Post-Sentence Motion, 2/27/2023, at 20-24 (unpaginated).

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

Thus, to allow an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court.

*Juray*, 275 A.3d at 1046-47 (quotation marks and citations omitted).

Our standard of review for weight of the evidence claims, however,

differs from that of the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court' s conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 1047 (citation omitted).

In addressing this claim, the trial court stated:

After a thorough review of the evidence, th[e trial c]ourt unequivocally determines that the guilty verdict on the charges is not against the weight of the evidence. To the contrary, the evidence strongly supports the verdict on each of the counts. The testimony from the many witnesses was compelling, was

corroborated by the testimony of other witnesses, and was corroborated by the admitted exhibits. The jury's verdict on these charges is not so contrary to the evidence as to shock one's sense of justice or conscience.

Trial Court Opinion, 7/25/2023, at 95.

Upon our review of the record, we discern no abuse of discretion by the trial court in determining that the jury appropriately weighed the evidence before it and that its verdict did not shock the conscience. *See Juray*, 275 A.3d at 1046-47; *see also Williams*, 302 A.3d at 120. The jury, as sole arbiter of credibility, did not credit Jonnala's defense that he was simply worried about A.J. and changes in his behavior, had trouble with the English language, and did not fully understand the ramifications of his email to Nusbickel. *See Commonwealth v. Clemons*, 200 A.3d 441, 464 (Pa. 2019) ("The jury is the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses."). To the extent Jonnala requests that we re-weigh the evidence, we may not do so. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact") (citation omitted). Accordingly, Jonnala's weight-of-the-evidence claim fails.

### IV.   Admission of Expert Testimony

In his final issue, Jonnala argues that the trial court abused its discretion in allowing the expert testimony of Attorney Samuel Stretton ("Stretton") at trial. Jonnala's Brief at 50-57. The trial court permitted Stretton's testimony as an expert in the field of attorney professional ethics and discipline. N.T.,

11/30/2024, at 197. The Commonwealth presented Stretton's testimony to show the harm Schneider could have faced as a result of Jonnala's abuse allegations, i.e., attorney discipline. *Id.* at 197-203. Jonnala argues that this evidence was irrelevant, prejudicial, and speculative. Jonnala's Brief at 50-55. He argues that the testimony "served no purpose other than generating sympathy" for Schneider because Schneider could have been subject to the same attorney discipline regardless of whether Jonnala's allegations were true or not. *Id.* at 50-51. Jonnala concedes Schneider was harmed, stating that "falsely accusing someone of child abuse would always cause them harm – anyone so accused would suffer harm to their reputation and employment." *Id.* at 51. Because Schneider was harmed by the false reports, Jonnala argues, Stretton's testimony was irrelevant. *Id.* Further, Jonnala contends that Schneider was not subject to attorney disciplinary action and thus, any "hypothetical harm" he could have faced was irrelevant. *Id.* at 51-55 (citing *Commonwealth v. Ostrosky*, 909 A.2d 1224 (Pa. 2006); *Commonwealth v. Walls*, 144 A.3d 926 (Pa. Super. 2016)).

The admissibility of evidence rests within the sound discretion of the trial court. *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015). The trial court's decision will be reversed only if the appellant sustains the heavy burden to show that the trial court abused its discretion. *Id.* (citation omitted). "It is not sufficient to persuade the appellate court that it might have reached a different conclusion; it is necessary to show an actual abuse

of the discretionary power." *Id.* (citation and brackets omitted). An abuse of discretion is not "a mere error of judgment, but rather exists where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* (citation and brackets omitted).

The record reflects that the parties addressed the issue of Stretton's testimony prior to trial on July 14, 2022, and August 29, 2022.[12] Thereafter, the trial court issued an order stating, in pertinent part, that the Commonwealth was permitted to introduce evidence of attorney disciplinary action Schneider may have faced had he been convicted of the crimes of indecent assault or sexual assault by sports official, volunteer or employee of non-profit association.[13] Order, 8/29/2022, ¶ 2. In its opinion, the trial court found Jonnala's claim lacked merit because the evidence was relevant to prove harm to Schneider. Trial Court Opinion, 7/25/2023, at 104-05.

_____

[12] At the July 14, 2022 hearing, Jonnala argued that the Commonwealth's evidence of harm to Schneider should be limited to Schneider's own testimony of "the emotional damage that happened to him." N.T., 7/14/2022, at 16. The trial court requested that the parties brief the issue and at the August 29, 2022 hearing, ruled in favor of the Commonwealth on this issue. N.T., 8/29/2022, at 2-3.

[13] 18 Pa.C.S. §§ 3126, 3124.3.

We discern no abuse of discretion by the trial court. To prove the crimes of retaliation and attempted retaliation,[14] the Commonwealth was required to show evidence of harm to Schneider as an element of the crimes. **See** 18 Pa.C.S. §§ 4953(a), 901(a). The defendant must inflict a harm that is distinct from the defendant's unlawful act. **See Ostrosky**, 909 A.2d at 1233; **Walls**, 144 A.3d at 935.

Instantly, the unlawful act that forms the basis of Jonnala's retaliation conviction is false reports of child abuse. As stated herein above, false reports of child abuse requires proof that a false report was made under the statute, e.g., to a mandated reporter or a child protective service agency employee. Harm to the victim—here, Schneider—is not required under the false reports of child abuse statute. Evidence of harm to Schneider (possible attorney discipline) is distinct from Jonnala's unlawful act (false reports of child abuse). Therefore, Stretton's testimony was relevant to provide evidence of harm, i.e., an attorney disciplinary action Schneider could have faced because of Jonnala's abuse allegations.

Although Jonnala does not dispute that Schneider was harmed, the harms he concedes are those that would be expected to befall a person falsely accused of committing child abuse. **See** Jonnala's Brief at 51 ("falsely accusing someone of child abuse would always cause them harm – anyone so

---

[14] As noted above, Jonnala was acquitted of the attempted retaliation charge. **See** Jury Verdict Slip, 12/2/2022.

accused would suffer harm to their reputation and employment"), 52 (stating the Commonwealth proved harm by showing that Schneider was suspended from scout events, had to have uncomfortable conversations with his family, friends, and neighbors, and his reputation suffered), 54 ("It is perfectly obvious that someone who gets accused of, charged with, or convicted of child abuse is going to suffer severe repercussions to their reputation, any professional licenses, and employability."). Indeed, **Ostrosky** and **Walls**—the very cases Jonnala relies upon to support his arguments—bely his assertion that Stretton's testimony was unnecessary.

In **Ostrosky**, Ostrosky was convicted, among other crimes, of retaliation under section 4953(a) for verbally threatening, on one occasion, previous crime-victims of Ostrosky. **Ostrosky**, 909 A.2d at 1225-26. As our Supreme Court stated, to satisfy the requirements of section 4953, the Commonwealth must prove that "a person, 1) caused harm, and that, 2) such harm resulted from an unlawful act." **Id.** at 1232. Our Supreme Court interpreted the statutory language of section 4953 and concluded that Ostrosky's single verbal threat to the crime-victims was not sufficient under the statute because the harm (feelings of concern and intimidation) was not distinct from the unlawful act (terroristic threat) as they are "feelings that one would expect to accompany any threat that was made." **Id.** at 1233. **See also Walls**, 144 A.3d at 935 (relying on **Ostrosky**'s holding to define the

harm required under section 4953.1(a) of the Crimes Code (relating to retaliation against a prosecutor or judicial official)).

Accordingly, the trial court did not abuse its discretion in admitting Stretton's testimony. Jonnala's fourth issue merits no relief. Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/15/2024